## REPUBLIC NATURAL GAS CO. *v.*
## OKLAHOMA ET AL.

No. 134.   Argued January 6, 1948.—Decided May 3, 1948.

*Robert M. Rainey* and *John F. Eberhardt* argued the cause and filed a brief for appellant.   *Robert C. Foulston* was also of counsel.

*Earl Pruet* argued the cause for appellees.   With him on the brief were *Mac Q. Williamson,* Attorney General of Oklahoma, and *Floyd Green.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal from a decision of the Supreme Court of Oklahoma, arising from an order of the State

Corporation Commission which concerned the correlative rights of owners of natural gas drawn from a common source.

Since 1913, Oklahoma has regulated the extraction of natural gas, partly to prevent waste and partly to avoid excessive drainage as between producers sharing the same pool. The legislation provided that owners might take from a common source amounts of gas proportionate to the natural flow of their respective wells, but not more than 25% of that natural flow without the consent of the Corporation Commission; that any person taking gas away from a gas field, except for certain specified purposes, "shall take ratably from each owner of the gas in proportion to his interest in said gas"; and that such ratable taking was to be upon terms agreed upon by the various well owners, or, in the event of failure to agree, upon terms fixed by the Corporation Commission.[1]

The Hugoton Gas Field is one of the largest in the United States, covering a vast area in several States, including Oklahoma. It was discovered in 1924 or 1925,

---

[1] L. 1913, c. 198, §§ 1–3 (Okla. Stat. (1941) tit. 52, §§ 231–33):

"Section 1. All natural gas under the surface of any land in this state is hereby declared to be and is the property of the owners, or gas lessees, of the surface under which gas is located in its original state.

"Section 2. Any owner, or oil and gas lessee, of the surface, having the right to drill for gas shall have the right to sink a well to the natural gas underneath the same and to take gas therefrom until the gas under such surface is exhausted. In case other parties, having the right to drill into the common reservoir of gas, drill a well or wells into the same, then the amount of gas each owner may take therefrom shall be proportionate to the natural flow of his well or wells to the natural flow of the well or wells of such other owners of the same common source of supply of gas, such natural flow to be determined by any standard measurement at the beginning of each calendar month; provided, that not more than twenty-five per cent of the natural flow of any well shall be taken, unless for good cause shown, and upon notice and hearing the Corporation Commission may, by

64

but the Oklahoma portion was not developed until 1937. Republic, a Delaware corporation, obtained permission to do business in Oklahoma in 1938, purchased gas leases in this field and drilled wells, removing the gas in its own pipelines. In 1944, the Peerless Oil and Gas Company completed a well in a portion of the gas field otherwise tapped only by Republic. It had no market for the gas obtained from this well, nor means of transporting such gas to any market. It offered to sell the gas to Republic, which refused it. Peerless then applied to the

---

proper order, permit the taking of a greater amount. The drilling of a gas well or wells by any owner or lessee of the surface shall be regarded as reducing to possession his share of such gas as is shown by his well.

"Section 3. Any person, firm or corporation, taking gas from a gas field, except for purposes of developing a gas or oil field, and operating oil wells, and for the purpose of his own domestic use, shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners and the party taking such, or in case they cannot agree at such a price and upon such terms as may be fixed by the Corporation Commission after notice and hearing; provided, that each owner shall be required to deliver his gas to a common point of delivery on or adjacent to the surface overlying such gas."

See also L. 1915, c. 197, §§ 4, 5 (Okla. Stat. (1941) tit. 52, §§ 239, 240):

"Section 4. That whenever the full production from any common source of supply of natural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom only such proportion of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears to the total natural flow ·of such common source of supply having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided, that the Corporation Commission may by proper order, permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said commission is authorized and directed to prescribe rules and

Corporation Commission for an order requiring Republic to take such gas from it "ratably"—that is, to take the same proportion of the natural flow of Peerless' well as Republic took of the natural flow of its own wells. After a hearing, the Commission found that the production of natural gas in the Hugoton field was in excess of the market demand; that Republic had qualified to do business in Oklahoma with full knowledge of the existing legislation requiring the ratable taking of natural gas; and that Republic was taking more than its ratable share

regulations for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another.

"Section 5. That every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale, and which may reasonably be reached by its trunk lines, or gathering lines without discrimination in favor of one producer as against another, or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation, shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportion that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing, from the duty of purchasing gas of an inferior quality or grade."

of gas from that portion of the field tapped both by its wells and that belonging to Peerless, thereby draining gas away from Peerless' tract and, in effect, taking property belonging to Peerless. The Commission ordered Republic:

> "1. . . . to take gas ratably from applicant's [Peerless'] well . . ., and to make necessary connection as soon as applicant lays a line connecting said well with respondent's [Republic's] line, and to continue to do so until the further order of this Commission; provided that, applicant shall lay its line from its well to the lines of respondent at some point designated by the respondent, but in said Section 14 in which said well of Peerless Oil and Gas Company has been drilled; and said respondent is required to make said designation immediately and without unreasonable delay, and in event of failure of respondent so to do, respondent shall no longer be permitted to produce any of its wells located in the Hugoton Oklahoma Gas Field.
>
> "2. The terms and conditions of such taking of natural gas by Republic Natural Gas Company from said Peerless Oil and Gas Company's well shall be determined and agreed upon by and between applicant and respondent; and in the event said parties are unable to agree, applicant and respondent are hereby granted the right to make further application to the Commission for an order fixing such terms and conditions; and the Commission retains jurisdiction hereof for said purpose."

On appeal, the Oklahoma Supreme Court affirmed, holding that Republic, having been given leave to enter the State on the basis of the legislation governing natural gas production, might not challenge its validity, and that neither the order nor the legislation on which it is based

runs counter to asserted constitutional rights. 198 Okla. 350. The court interpreted the Commission's order as giving Republic "a choice between taking the gas from Peerless and paying therefor direct, or marketing the gas and accounting to Peerless therefor, or to shut in its own production from the same common source of supply." 198 Okla. at 356. Invoking both the Due Process and the Equal Protection clauses of the Fourteenth Amendment, Republic appealed to this Court.

This case raises thorny questions concerning the regulation of fugacious minerals, of moment both to States whose economy is especially involved and to the private enterprises which develop these natural resources. Cf. *Thompson* v. *Consolidated Gas Utilities Corp.*, 300 U. S. 55; *Railroad Commission* v. *Rowan & Nichols Oil Co.*, 310 U. S. 573, 311 U. S. 570. Before reaching these constitutional issues, we must determine whether or not we have jurisdiction to do so.

Ever since 1789, Congress has granted this Court the power of review in State litigation only after "the highest court of a State in which a decision in a suit could be had" has rendered a "final judgment or decree." § 237 of the Judicial Code, 28 U. S. C. § 344, rephrasing § 25 of the Act of September 24, 1789, 1 Stat. 73, 85. Designed to avoid the evils of piecemeal review, this reflects a marked characteristic of the federal judicial system, unlike that of some of the States. This prerequisite for the exercise of the appellate powers of this Court is especially pertinent when a constitutional barrier is asserted against a State court's decision on matters peculiarly of local concern. Close observance of this limitation upon the Court is not regard for a strangling technicality. History bears ample testimony that it is an important factor in securing harmonious State-federal relations.

No self-enforcing formula defining when a judgment is "final" can be devised. Tests have been indicated

which are helpful in giving direction and emphasis to decision from case to case. Thus, the requirement of finality has not been met merely because the major issues in a case have been decided and only a few loose ends remain to be tied up—for example, where liability has been determined and all that needs to be adjudicated is the amount of damages. *Bruce* v. *Tobin,* 245 U. S. 18; *Martinez* v. *International Banking Corp.,* 220 U. S. 214, 223; *Mississippi Central R. Co.* v. *Smith,* 295 U. S. 718. On the other hand, if nothing more than a ministerial act remains to be done, such as the entry of a judgment upon a mandate, the decree is regarded as concluding the case and is immediately reviewable. *Board of Commissioners* v. *Lucas,* 93 U. S. 108; *Mower* v. *Fletcher,* 114 U. S. 127.

There have been instances where the Court has entertained an appeal of an order that otherwise might be deemed interlocutory, because the controversy had proceeded to a point where a losing party would be irreparably injured if review were unavailing. Cf. *Clark* v. *Williard,* 294 U. S. 211; *Gumbel* v. *Pitkin,* 113 U. S. 545; and compare *Forgay* v. *Conrad,* 6 How. 201, 204, with *Barnard* v. *Gibson,* 7 How. 650, 657. For related reasons, an order decreeing immediate transfer of possession of physical property is final for purposes of review even though an accounting for profits is to follow. In such cases the accounting is deemed a severed controversy and not part of the main case. *Forgay* v. *Conrad, supra; Carondelet Canal Co.* v. *Louisiana,* 233 U. S. 362; *Radio Station WOW* v. *Johnson,* 326 U. S. 120. But a decision that a taking by eminent domain is for a public use, where the amount of compensation has not been determined, is not deemed final, certainly where the property will not change hands until after the award of compensation. *Grays Harbor Logging Co.* v. *Coats-Fordney Co.,* 243 U. S. 251;

cf. *Luxton* v. *North River Bridge Co.*, 147 U. S. 337; *Catlin* v. *United States*, 324 U. S. 229.[2]  One thing is clear. The considerations that determine finality are not abstractions but have reference to very real interests—not merely those of the immediate parties but, more particularly, those that pertain to the smooth functioning of our judicial system.

On which side of the line, however faint and faltering at times, dividing judgments that were deemed "final" from those found not to be so, does the judgment before us fall?  The order of the Oklahoma Corporation Commission, as affirmed below, terminates some but not all issues in this proceeding.  Republic is required to take ratably from Peerless, but it may do so in any one of three ways.  If, as is most probable, Republic would choose not to close down its own wells, under the Commission's order it must allow Peerless to connect its well to Republic's pipeline.  But there has been left open for later determination, in event of failure to reach agreement, the terms upon which Republic must take the gas, the rates which it must pay on purchase, or may charge if it sells as agent of Peerless.  Does either its alternative character, or the fact that it leaves matters still open for determination, so qualify the order as to make it short of "final" for present review?

We turn first to the latter point.  Certainly what remains to be done cannot be characterized as merely "ministerial."  Whether or not the amount of gas to be taken by Republic from Peerless can be ascertained through application of a formula, the determination of the

---

[2] In the *Catlin* case our decision was based on the general rule that condemnation orders prior to determination of just compensation are not appealable. The wartime statutes there involved were urged by the claimants as a reason for not applying the general rule. We rejected this contention.

price to be paid for the gas if purchased, or the fees to be paid to Republic for marketing it if sold on behalf of Peerless, clearly requires the exercise of judgment.[3] Nor is there any immediate threat of irreparable damage to Republic, rendering postponed review so illusory as to make the decree "final" now or never. The Commission's order requires Republic to designate a point on its pipeline at which Peerless might attach a line, and after Peerless had done so to connect it immediately. But it does not appear that the order requires Republic to commence taking Peerless' gas before the terms of taking have either been agreed upon or ordered by the Commission. Nor does it appear that Republic would have to bear the expense of connecting the pipeline, nor that such expense would be substantial. Indeed, the incurring of some loss, before a process preliminary to review here is exhausted, is not in itself sufficient to authorize our intervention. Cf. *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–52. But even if the Commission's order were construed to require Republic to take and dispose of Peerless' gas immediately—and we are not so advised by the State court—there is no ground for assuming that any loss that Republic might incur could not be recovered should the completed direction of the Oklahoma Commission, on affirmance by that State's Supreme Court, ultimately be found to be unconstitutional. Merely because a party to a litigation may be temporarily out of pocket, is not sufficient to warrant immediate review of an incomplete State judgment. Appellant, of course, has the burden of

---

[3] This case is unlike those in which a rate had been fixed, subject to a continuing jurisdiction to modify it later. Cf. *Market Street R. Co.* v. *Railroad Commission*, 324 U. S. 548; *St. Louis, Iron Mountain & Southern R. Co.* v. *Southern Express Co.*, 108 U. S. 24. Here, no rates have been set, and their future establishment has been left open.

affirmatively establishing this Court's jurisdiction. *Memphis Natural Gas Co.* v. *Beeler,* 315 U. S. 649, 651. The policy against premature constitutional adjudications demands that any doubts in maintaining this burden be resolved against jurisdiction. See citation of cases in the concurring opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341, 345, 348.

The condemnation precedents attract this case more persuasively than do the accounting cases. Where it is claimed that a decree transferring property overrides an asserted federal right, as in *Forgay* v. *Conrad, supra,* and *Radio Station WOW* v. *Johnson, supra,* no disposition of the subsequent accounting proceeding can possibly make up for the defeated party's loss, since the party who has lost the property must also pay to his opponent what the accounting decrees. Hence his desire to appeal the issue of the right to the property will almost certainly persist. On the other hand, in an eminent domain case, as in a case like this, the fate of the whole litigation may well be affected by the fate of the unresolved contingencies of the litigation. An adequate award in an eminent domain case or a profitable rate in the case before us might well satisfy the losing party to acquiesce in the disposition of the earlier issue. It is of course not our province to discourage appeals. But for the soundest of reasons we ought not to pass on constitutional issues before they have reached a definitive stop. Another similarity between this case and the condemnation cases calls for abstention until what is organically one litigation has been concluded in the State. It is that the matters left open may generate additional federal questions. This brings into vivid relevance the policy against fragmentary review. In accounting cases, that which still remains to be litigated can scarcely give rise to new federal questions.

The policy against fragmentary review has therefore little bearing. But contests over valuation in eminent domain cases, as price-fixing in this type of case, are inherently provocative of constitutional claims. This potentiality of additional federal questions arising out of the same controversy has led this Court to find want of the necessary finality of adjudicated constitutional issues in condemnation decrees before valuation has been made. Like considerations are relevant here.

In short, the guiding considerations for determining whether the decree of the court below possesses requisite finality lead to the conclusion that this case must await its culmination in the judicial process of the State before we can assume jurisdiction. "Only one branch of the case has been finally disposed of below, therefore none of it is ripe for review by this court." *Collins* v. *Miller*, 252 U. S. 364, 371. This makes it unnecessary to consider whether the mere fact that the decree gave alternative commands precluded it from being final. Cf. *Paducah* v. *East Tennessee Tel. Co.*, 229 U. S. 476; *Jones's Adm'r* v. *Craig*, 127 U. S. 213; Note, 48 Harv. L. Rev. 302, 305–306. Since the judgment now appealed from lacks the necessary finality, we cannot consider the merits. All of Republic's constitutional objections are of course saved.

*Appeal dismissed.*

MR. JUSTICE DOUGLAS, concurring.

The judgment of the Oklahoma court is not "final" merely because it establishes that Republic has no right to drain away the Peerless gas without paying for it. I think it would be conceded that, even so, the judgment would not be "final" if it offered appellant three alternative ways to comply and there were doubts as to the constitutionality of any one of them. Then we would wait

to see which of the alternatives was ultimately selected or imposed before reviewing the constitutionality of any of them. But there would be no more reason to defer decision on the merits in that case than in this. For the constitutional questions would be isolated in each and we would be as uncertain in one as in the other which of the alternatives would actually apply to appellant. And the principle seems to me to be the same even when a majority of us would sustain the order whatever alternative was chosen as its sanction.

There is, of course, in the one case the chance of saving the order only if one remedy rather than another is chosen, while in the other the order would survive whichever was chosen. But in each we would be giving needless constitutional dissertations on some points. That is nonetheless true in a case where the constitutional questions seem to a majority of us simple, uncomplicated and of no great dignity. For the single constitutional question necessary for decision will not be isolated until the precise pinch of the order on the appellant is known. It will not be known in the present case at least until appellant elects or is required (1) to shut down, (2) to become a carrier of the Peerless gas, or (3) to purchase it.

The legal, as well as the economic, relationship which Republic will bear to Peerless will vary as one or another choice is made. To make Republic a "carrier" is to submit it to different business risks than to make it a "purchaser." The fact that each would raise only questions of "due process" under the Fourteenth Amendment does not mean that the questions are identical. Even when reasonableness is the test, judges have developed great contrariety of opinions. The point is that today the variables are presented only in the abstract. Tomorrow the facts will be known, when the precise impact of the order on appellant will be determined. Thus to me the

policy against premature constitutional adjudication precludes us from saying the judgment in the present case is "final."

MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE BLACK, MR. JUSTICE MURPHY, and MR. JUSTICE BURTON join, dissenting.

I think the Oklahoma Supreme Court's judgment is final for the purposes of § 237 of the Judicial Code, 28 U.' S. C. § 344, that the state commission's order is valid, and that deferring decision on the merits to some indefinite future time will only prolong an already lengthy litigation unnecessarily and with possible irreparable harm to one party or the other.

Appellant, Republic Natural Gas Company, has operated gas wells in the Hugoton Gas Field for many years. It was the first major producer to exploit the Oklahoma portion of the field,[1] having constructed its own gathering system and pipe lines extending from Oklahoma into Kansas. With only minor exceptions Republic has never carried any but its own gas in its pipe lines.[2] 198 Okla. at 352.

In 1944 appellee, Peerless Company, completed its only well in Oklahoma, in the Hugoton field. This well is not connected to any pipe line. It therefore presently lies dormant. Surrounding Republic wells drilled into the same reservoir concededly are draining gas constantly from under the Peerless land.[3] Except for the part of

---

[1] Republic has 92 wells in Kansas and 38 in Oklahoma.

[2] The Oklahoma Supreme Court found it unnecessary to consider whether Republic was either a common-carrier or a common purchaser of gas. 198 Okla. at 353. The term "common purchaser" is explained in Okla. Stat., tit. 52, § 240.

[3] Appellant concedes that the "operation of the Republic wells is draining gas from under the dormant Peerless well." The findings of the commission state: "(d) Republic . . . is taking and will continue to take more than its proportionate part of the natural

Republic's gathering system which runs across the Peerless land, no market outlet that would take sufficient gas to justify production of the Peerless well is close enough to make it financially practical for Peerless to construct its own pipe line. It is undisputed that the only feasible method of producing the well is to require Republic to take Peerless gas into its gathering system.[4]

For this reason Peerless applied to the Oklahoma Corporate Commission for an order compelling Republic to connect its pipe line to the Peerless well and to purchase gas from Peerless at a price to be fixed by the commission. After hearing, the commission concluded that the applicable Oklahoma statutes[5] required it to enforce ratable taking and ratable production of gas as between Republic and Peerless.

The commission recognized alternative methods of protecting Peerless from loss due to drainage, first by ordering

---

gas in said field unless required to take ratably from said well of Peerless . . . .

"(e) Republic . . . is draining gas from underneath said Section 14 into which said Peerless Oil and Gas Company's well has been drilled, and will continue to drain gas from underneath said Section 14 until all the gas thereunder has been drained and Peerless . . . will be prevented from taking its proportionate share of the natural gas in the field unless Republic . . . is required to take gas ratably from [Peerless]."

[4] The Report of the commission states: "It is evident from all the facts and circumstances in this case that if the Peerless Company is to be allowed to produce gas from its well, this gas must be by it transported fifteen to thirty miles, unless said gas is transported or disposed of by the Republic Natural Gas Company.

"It would be impractical from a financial standpoint to construct a pipeline to any city or other market outlet that would take sufficient gas to justify the production of this well; and it would be impossible to economically operate the well under present conditions existing in that field unless the gas is taken into the pipeline of the Republic Natural Gas Company."

[5] Okla. Stat., tit. 52, §§ 232, 233, 239, 240, 243.

all wells in the area to shut down completely, and second by ordering Republic to purchase from Peerless. Since the first method was considered harsh, the second was preferred. Accordingly the commission issued an order requiring Republic to take gas ratably from the Peerless well as soon as the necessary connection could be made, allowing it, however, the alternative of closing down all of its wells in the Oklahoma portion of the field if it preferred this to taking the Peerless gas. The terms and conditions of the taking were to be determined by the parties; but, in the event of failure to agree, they were "granted the right to make further application to the Commission for an order fixing such terms and conditions . . . ." [6] The taking, however, was not to await this agreement or further order; it was to begin at once. [7]

---

[6] The order required Republic "1. . . . *to take gas ratably* from [Peerless] *and to make necessary connection as soon as applicant lays a line connecting* said well with respondent's line, and to continue to do so until the further order of this Commission; provided that, applicant shall lay its line from its well to the lines of respondent at some point designated by the respondent, but in said Section 14 in which said well of Peerless . . . has been drilled; *and said respondent is required to make said designation immediately and without* unreasonable delay, and in event of failure of respondent so to do, respondent shall no longer be permitted to produce any of its wells located in the Hugoton Oklahoma Gas Field. [Emphasis added.]

"2. The terms and conditions of such taking of natural gas by [Republic] from [Peerless] shall be determined and agreed upon by and between applicant and respondent; and in the event said parties are unable to agree, applicant and respondent are hereby granted the right to make further application to the Commission for an order fixing such terms and conditions; and the Commission retains jurisdiction hereof for said purpose."

[7] See note 6. The order's language leaves no room for the inference, which appears to be injected here, that the taking was not required to begin until the terms had been agreed upon or determined by further order.

Affirming the order, the Supreme Court of Oklahoma construed the state statutes to authorize the administrative action. 198 Okla. 350. The case thus presents on the merits the question whether a state, as a means of adjusting private correlative rights in a common reservoir, has the power in such circumstances as these to compel one private producer to share his market with another, when otherwise his production would drain off that other's ratable share of the gas in place and thus appropriate it to himself.

## I.

The majority consider that the proceedings in the state tribunals have not terminated in a final judgment from which appeal to this Court lies, and therefore refuse to adjudicate this question.

In the strictest sense the state proceedings will not be completed until the parties have agreed upon the terms and conditions of Republic's taking of gas from Peerless or, if they do not agree, until the commission has issued an additional order fixing those terms. Since it is not certain that the parties will agree, the possibility remains that a further order may be required before all phases of the controversy are disposed of. It is this possibility, as I think a remote one, which furnishes one of the grounds for concluding that the Oklahoma court's judgment is not final within the meaning and policy of § 237.

The fact that all phases of the litigation are not concluded does not necessarily defeat our jurisdiction. This is true, although as recently as *Gospel Army* v. *Los Angeles,* 331 U. S. 543, we reiterated that, for a judgment to be final and reviewable under § 237, "it must end the litigation by fully determining the rights of the parties, so that nothing remains to be done by the trial court 'except the ministerial act of entering the judgment which the

appellate court . . . directed.' " 331 U. S. at 546. This is the general rule, grounded in a variety of considerations reflected in the statutory command [8] and coming down to the sum that, in exercising the jurisdiction conferred by § 237, this Court is not to be concerned with reviewing inconclusive, piecemeal, or repetitious determinations. The *Gospel Army* case represents a typical instance for applying the terms and the policy of § 237.[9] But not every decision by a state court of last resort leaving the controversy open to further proceedings and orders is either inconclusive of the issues or premature for purposes of review under § 237. This appears most recently from the decision in *Radio Station WOW* v. *Johnson,* 326 U. S. 120, which applied a settled line of authorities to that effect. Cf. *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69.

In such cases the formulation of the test of finality made in the *Gospel Army* and like decisions has not been followed. Instead that question, in the special circumstances, has been treated as posing essentially a practical problem, not one to be determined either by the label attached to the state court judgment by local law, *Richfield Oil Corp.* v. *State Board, supra,* or by the merely mechanical inquiry whether some further order or proceeding beyond "the ministerial act of entering the judgment" may be had or necessary after our decision is rendered. *Radio Station WOW* v. *Johnson, supra* at 125.

The *WOW* opinion noted that the typical case for applying the broader, less mechanical approach to the

---

[8] Some of the considerations are enumerated in *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 123–124.

[9] Under California procedure the state supreme court's unqualified order for reversal was "effective to remand the case 'for a new trial and [place] the parties in the same position as if the case had never been tried.' " 331 U. S. at 546 and authorities cited. The effect was thus to leave all issues inconclusively determined pending further proceedings in the trial court.

question of finality had involved judgments directing the immediate delivery of property, to be followed by an accounting decreed in the same order. It stated, with reference to these and like situations: "In effect, such a controversy is a multiple litigation allowing review of the adjudication which is concluded because it is independent of, and unaffected by, another litigation with which it happens to be entangled." 326 U. S. at 126. Accordingly, since the two phases of the controversy were separate and distinct, we exercised our jurisdiction to determine the federal questions involved in the phase concluded by the state court's decision. This was done, although the judgment required further and possibly extensive judicial proceedings before the other and separable phase of the accounting could reach a final determination.[10] Those further proceedings involved very much more than "ministerial acts"; indeed the determination of a complicated accounting requires the highest order of judicial discretion.

Notwithstanding this and despite the want of strict finality, jurisdiction was sustained because a number of factors were felt to require that action in order to give effect to the policy of § 237 providing for review, rather than to a merely mechanical application of its terms for denying review.

There was nothing tentative or inconclusive about the Nebraska court's judgment for immediate delivery of the property. Nor was it necessary to execution of that phase of the judgment to have contemporaneous conclu-

---

[10] The two prior decisions deemed decisive against mechanical determination of finality in such situations were *Forgay* v. *Conrad*, 6 How. 201, and *Carondelet Canal Co.* v. *Louisiana*, 233 U. S. 362, the former of which we noted had "stood on our books for nearly a hundred years in an opinion carrying the authority, especially weighty in such matters, of Chief Justice Taney." 326 U. S. 120, 125.

sion of the accounting phase.  Except for the latter, the judgment was ripe for review.  Indeed immediate execution without review of the federal questions affecting the delivery phase until after the accounting had been completed, offered the possibility of irreparable harm to one or possibly both of the parties.  This factor obviously tended to make later full review partly or wholly futile. Moreover, until the delivery phase had been settled, it could not be known whether the accounting would be necessary, for that need was consequentially incident to and dependent upon determination of the core of the litigation, which was the right to delivery.

In these circumstances it was rightly considered more consistent with the intent and purpose of § 237 to allow immediate review, notwithstanding the possibility of a later further review in the accounting phase, than to deny review with the chance that a later one might not fully save the parties' rights.  The section's policy to furnish full, adequate and prompt review outweighed any design to secure absolute and literal "finality."

In all these respects this case presents a parallel to the *WOW* case too close, in my opinion, for distinguishing between them.  Republic is not directed to negotiate terms and on completing the negotiation to make its facilities available to Peerless.  It is ordered to make a connection with Peerless and to begin carrying gas at once.  That phase of the order, like the delivery phase in the accounting cases, does not await the fixing of the terms whether by agreement or by further order.[11]  It is a present obligation, effective immediately and without qualification.[12] See *Knox Loan Assn.* v. *Phillips,* 300 U. S. 194, 198.

---

[11] See notes 6, 7 *supra* and text.

[12] In the remote event that Republic should elect to shut down production, there would be no need for a further order or agreement of the parties, and the presently erected obstacle to finality would be completely removed.

Moreover there is nothing tentative or inconclusive about this phase of the order or the state judgment sustaining it. That phase not only is separable from the matter of fixing the terms; like the order for delivery in the *WOW* case, it is the main core of the controversy to which the aspect of fixing terms is both consequential and incidental. The *WOW* order required immediate delivery of property, with consequent possibility of irreparable harm. Here the order required immediate acceptance of delivery, with similar possibility of injury for one party or the other.[13]

Neither is there greater likelihood of piecemeal consideration of constitutional and other questions than in the *WOW* case. Cf. 326 U. S. at 127. The matter of fixing terms here hardly can be more difficult practically or more complex legally than making the accounting in the *WOW* case.[14] It is hard also to see how one would be either more or less likely to throw up new constitutional issues than

---

[13] To permit Republic to continue drainage from beneath Peerless' land for the indefinite period required for sending the case back to the Oklahoma tribunals and then bringing it back here a second time will be to deprive Peerless of that gas unless the state law allows compensation for such continued taking from the date of the present order. It is at least highly doubtful that the state law allows such a remedy, even if the order is eventually held valid.

On the other hand, if the order should be invalidated on the deferred review, Republic will have been put to further and unnecessary delay, uncertainty and expense in ascertaining its rights, merely to secure a determination which cannot possibly affect them. If this may not be irreparable injury, it certainly is not the policy of § 237.

[14] In view of marketing conditions in this industry, no such problem of valuation or of reaching agreement upon it would be presented as, for instance, in the case of seeking to place a value upon real estate taken by condemnation for public use or valuation of property for rate-making purposes. The idea that determining the value of the gas taken here would present all the difficulties of valuing a railroad for rate-making purposes blows the matter up beyond all the practicalities of the situation.

the other. Nor can the *WOW* case be taken to rule that this Court could not or would not consider constitutional issues arising on the accounting phase, unlikely though the necessity for its doing so may have been. There is thus a substantially complete parallel between the situation now presented and that in the *WOW* line of cases.

In one respect this case is stronger for finding appealable finality. For here no further order may be necessary or made, since present resolution of the basic constitutional problem in all probability will end the entire controversy. That certainly would be the result if the decision should go against Peerless or if Republic should elect to shut down production. And if the decision should be in Peerless' favor, it is hardly likely that the parties will be unable to agree upon terms since, in case of failure to agree, the commission will prescribe them.[15] The case indeed is not basically a controversy over terms at all. They present only a contingent, collateral matter. What is fundamentally at stake is the right of Republic to take the gas from beneath Peerless' land and market it without paying Peerless for it. Once that question is finally determined, as it can be only by this Court's decision of the constitutional question, the need for a further order will become highly improbable.

This case therefore is one in which the need for further proceedings may never arise and almost certainly would not do so if the constitutional question were now determined. Indeed, in a closer factual application than the *WOW* case, it presents in the jurisdictional aspect an almost exact parallel to the order reviewed in *Pierce Oil Corp.* v. *Phoenix Refining Co.*, 259 U. S. 125, where the Oklahoma commission required the appellant to carry oil for the appellee at unspecified rates. Cf. *Gulf Refining*

---

[15] See note 14.

*Co.* v. *United States,* 269 U. S. 125; *Clark* v. *Williard,* 292 U. S. 112.

The parallel to the *WOW* line of decisions, however, is put aside and this case is decided by analogy to condemnation cases, particularly *Grays Harbor Logging Co.* v. *Coats-Fordney Co.,* 243 U. S. 251. The analogy is inapposite. It is true that in such cases this Court generally, though not uniformly,[16] has held that the trial court judgment is not final until after the award of compensation is made. The decisions were properly rendered, but for reasons not applicable here. In the *Grays Harbor* case the state constitution and controlling legislation prohibited the transfer of the condemned property until after the compensation had been determined and paid. Thus the issue of the right to take was necessarily dependent for final resolution on the determination of the amount of compensation.[17] The controversy was not separable into distinct phases as in the *WOW* case and here. 243 U. S. at 256.[18] Nor had the state judgment already affected the appellant's property rights, as was true in the *WOW* case and is true here.

In *Catlin* v. *United States,* 324 U. S. 229, the question of the right to take was settled conclusively below before the award of damages was fixed. But there to have permitted an appeal from the order transferring possession would have produced delays inconsistent with the over-

---

[16] *Wheeling & Belmont Bridge Co.* v. *Wheeling Bridge Co.,* 138 U. S. 287.

[17] The same was said to be true of *Luxton* v. *North River Bridge Co.,* 147 U. S. 337. See *id.* 341.

[18] Moreover, under state practice review of the condemnation order by the state supreme court was by certiorari, not by appeal which lay only from the order fixing damages. As a matter of state law, therefore, the judgment on the condemnation order was interlocutory. See, however, as to this *Catlin* v. *United States,* 324 U. S. 229, 234; *Luxton* v. *North River Bridge Co.,* 147 U. S. 337.

riding purpose and policy of the War Purposes and Declaration of Taking Acts. 26 Stat. 316, as amended by 40 Stat. 241, 518; 46 Stat. 1421. 324 U. S. at 235, 238, 240. Here the converse is true, for to refuse to pass on the merits can serve only to prolong the litigation without compensating advantage for the policy of § 237 or other enactment. There is no overriding policy of independent legislation, comparable to that of the War Purposes and Declaration of Taking Acts, dictating denial or deferring of review.

The asserted analogy to the *Grays Harbor, Catlin* and *Luxton* (see note 17) cases therefore does not hold for the entirely different situations now presented. In them either there was no separable phase of the litigation; or statutory policy independent of § 237 or other like requirement of finality forbade review before ultimate disposition of every phase of the litigation in the state or inferior federal courts. The condemnation cases therefore, though generally uniform in denying review of orders for condemnation prior to award of damages, are not uniform in resting this result wholly on the requirement of "finality" made by § 237 and like provisions for review, but frequently rest on other and independent grounds pertinent to the application of those provisions.

The "penumbral area" of appealable finality, see 326 U. S. at 124, may not be sweeping in its scope. It is nevertheless one essential to prevent the letter of the section from overriding its reason. For this purpose it would seem to comprehend any situation presenting separable phases of litigation, one involving the core or crux of the controversy between the parties, the other collateral matters dependent for the necessity of their consideration and decision upon final and unqualified disposition of the hub of the dispute. If a merely mechanical application of § 237 is to be avoided, it cannot be taken that the practical approach of the *WOW* line of decisions must

be limited exclusively to cases where an accounting is ordered to follow delivery of property decreed at the same time. The reason of the exception, indeed of § 237 itself, is not so limited. Because the delivery and accounting cases are not the only ones presenting such problems, judgment must be given some play in other situations as well to decide whether the vices excluded by the policies underlying § 237 are present, as they may be or not according to the character and effects of the particular determination sought to be reviewed.

Finally, it hardly can be that merely the alternative character of the order *per se* deprives it of finality, regardless of whether any of the alternatives presents a substantial federal question. Because Republic is allowed to choose between shutting down its wells and carrying or purchasing the Peerless gas, it seems to be thought that the order lacks finality until that choice is made, even though when made either course would be clearly within the state's power to require.

The argument would have more force if the difference between the alternatives were great enough to make it likely that contrary results might be reached on the different alternatives. But where as here the difference emphasized, *e. g.,* is merely between the passage of title before and after the carriage, it is hard to see how there could be more difficulty with one alternative than with the other. See Part II; also Part IV. So minor a distinction hardly furnishes a substantial basis for contrariety of judicial opinion on due process questions. Nor is it suggested that allowing the choice between either of those two courses and shutting down presents greater difficulty. Given constitutionality of all alternatives, it no more transcends state power to permit the party affected to select the course least onerous than to require him to follow the one most burdensome. It is equally hard to see how giving the choice destroys the order's

finality, unless again a wholly mechanical conception of that term as used in § 237 is to control.

The section's policy is against hypothetical, premature and piecemeal constitutional decision, not against a choice of alternatives presenting no such problem. Here the question is whether Oklahoma can offer Republic the choice of shutting down production or taking and paying for the Peerless gas. Either course will protect the latter's rights against drainage by Republic. Either standing alone in the order's terms would not affect finality. Neither, merely upon the premise that alternative character *per se* destroys finality, presents a doubtful question of constitutionality. And finally the alternative of shutting down, realistically considered, is more nearly sanction than alternative mode of compliance.[19]

In such circumstances to say that coupling the two courses alternatively deprives the order of finality seems to me to be giving to the terms of § 237 a mechanical application out of harmony with the section's policy, just as does refusing to decide the case before it is known whether a further order may be necessary for fixing the price of the Peerless gas. Such a view can only handicap administrative action either by forcing orders to specify a single course of compliance when alternatives may be much more desirable, or by delaying review and thus

---

[19] Cf. *Wabash and Erie Canal* v. *Beers*, 1 Black 54; *Milwaukee and Minnesota R. Co.* v. *Soutter*, 2 Wall. 440.

Control of production, of course, is the core of state conservation programs. In *Champlin Rfg. Co.* v. *Comm'n*, 286 U. S. 210, proration orders limiting production of oil wells to as little as six per cent of capacity were sustained. See p. 229. Cf. *Walls* v. *Midland Carbon Co.*, 254 U. S. 300; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61. The power of a state to protect correlative rights hardly can be regarded as furnishing a less solid basis for control of production than the power to prevent waste. See note 29 and text *infra*.

effective administrative action until one or perhaps all of the alternatives in turn are tried out first in election and then in review. A decision now would settle every substantial pending phase of the controversy. At the most but a minor consequential and separable aspect would remain for remotely possible further action in the state tribunals. It is to the interest of both parties, and the state authorities as well, that their rights be determined and the controversy be ended. And on the facts the question of jurisdiction is closely related to the merits.

In view of all these considerations, to deny the parties our judgment now is to make a fetish of technical finality without securing any of the substantial advantages for constitutional adjudication which § 237, in the light of its underlying policies, was designed to attain. Instead that section becomes an instrument of sheer delay for the performance of our function, for executing those of state agencies, and for settling parties' rights. The section has no such office. By declaring now that the state may follow either of two clearly permissible courses and allow those with whom it deals to choose between them, we would not speak hypothetically or prematurely or violate any other policy underlying § 237.

## II.

Beyond the matter of jurisdiction, there is in this case no such question concerning its exercise as arose in *Rescue Army* v. *Municipal Court*, 331 U. S. 549. The constitutional issues are not speculative, premature or presented abstractly *en masse*. The "alternative character" of the state judgment does not prevent the federal questions from being sufficiently precise and concrete for purposes of decision here, although various ambiguities have been suggested.

Thus it is said that we cannot tell whether the order compels Republic to share its market or merely requires it to carry gas to a market which Peerless must obtain for itself. Cf. *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55. The order here is not subject to such an ambiguity. It in terms commands Republic to take Peerless gas and to pay for it.[20]

It is also suggested that we cannot tell whether Republic will have to purchase gas from Peerless or just transport the gas to market and account for the profits. But whether legal title passes at one end of the Republic line or at the other is, as we have noted, wholly immaterial as a matter of constitutional law. Cf. *The Pipe Line Cases*, 234 U. S. 548. In either event under the order and judgment Republic must take Peerless gas into its system, must pay for it and, unless its market should expand suddenly far beyond present expectations, must therefore share its market with Peerless.

It is said further that we cannot be sure whether the commission intends to make Republic act as a common carrier. The only basis for this doubt is the fact that the commission's findings state that Republic is a common carrier and common purchaser. But the state supreme court upheld the order on the assumption that those findings were incorrect. The justification for re-

---

[20] In its report the commission concluded that Republic should be required to ". . . allow the Peerless gas to enter the Republic pipeline, and pay the Peerless Company for the gas." The order itself in unqualified terms directs Republic "to take gas ratably from [Peerless] . . . as soon as applicant lays a line connecting said well with respondent's line . . . ." See notes 6, 7.

Since neither the commission's report nor the state supreme court's opinion suggests that the command was qualified by the condition that Peerless obtain its own market, we need not read such a condition into the order. The commission report states that "Republic offers to transport the Peerless gas if market can be obtained by [Peerless] . . . ."

quiring Republic to carry Peerless gas is based primarily on the fact of drainage caused by Republic's production.

### III.

It has been noted previously that the question on the merits is not unrelated to the issue of finality. To it, accordingly, attention is now directed. The real fight, as has been stated, is over the right of Republic to drain away the Peerless gas without paying for it. The question as cast in legal terms is whether the due process and equal protection clauses of the Fourteenth Amendment deny Oklahoma the power to give one private producer from a common pool the option to shut down production altogether or to purchase gas from another for the purpose of adjusting their correlative rights in the pool, when that is the only practical or feasible alternative consistent with production by both to protect the latter from drainage by the former.

Republic denies the state's power to do this. Its basic position is that it has a federal constitutional right to drain off all the gas in the field, unless other owners of producing rights can supply their own facilities for marketing their production, regardless of varying conditions in different competitive situations and regardless of all consequent practical considerations affecting feasibility of furnishing such facilities.

Republic has no such right. The Constitution did not impress upon the states in a rigid mold either the common-law feudal system of land tenures or any of the modified and variant forms of tenure prevailing in the states in 1789. Rather it left them free to devise and establish their own systems of property law adapted to their varying local conditions and to the peculiar needs and desires of their inhabitants. The original constitution placed no explicit limitation upon the powers of the states in

this respect.[21]  Not until the Fourteenth Amendment was ratified, nearly eight decades later, was one introduced.

The Fourteenth Amendment was not designed to nullify state power to create institutions of property in accord with local needs and policies.  Whether or not it was intended to secure substantive individual rights as well as procedural ones,[22] it was not a strait jacket immobilizing state power to change or alter institutions of property in the public interest.[23]  Almost innumerable decisions have demonstrated this, even though the Amendment has been effective to create substantial limitations upon the methods by which the changes deemed necessary may be made.

The basic question here is really one of substantive due process.  It relates primarily to whether Oklahoma can curtail the unqualified right of capture which appellant conceives it acquired by virtue of and as an unalterable incident to its acquisition of surface rights including the right to drill for gas.  For, in denying that the state

---

[21] The nearest approximations perhaps were in the prohibitions against state legislation impairing the obligation of contracts and against *ex post facto* legislation before the latter was limited to criminal and penal consequences.  *Calder* v. *Bull*, 3 Dall. 386.  See Hale, The Supreme Court and the Contract Clause, 57 Harv. L. Rev. 512, 621, 852.

[22] See Mr. Justice Black dissenting in *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 423; Boudin, Truth and Fiction about the Fourteenth Amendment, 16 N. Y. U. L. Q. Rev. 19.

[23] It is precisely in cases where the Amendment has been made thus effective, often by giving expansive scope to the idea of "property," that its interpretations have failed to withstand the test of time.  Compare *Ribnik* v. *McBride*, 277 U. S. 350, with *Olsen* v. *Nebraska*, 313 U. S. 236; *Adair* v. *United States*, 208 U. S. 161, and *Coppage* v. *Kansas*, 236 U. S. 1, with *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 187; *Lochner* v. *New York*, 198 U. S. 45, and *Adkins* v. *Children's Hospital*, 261 U. S. 525, with *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379.

can enforce the only feasible method of limitation consistent with production by Peerless, Republic in effect is saying that the state cannot restrict its right to take all gas in the common reservoir, including all that can be drained from beneath Peerless' lease and the lands of other owners similarly situated. This is, for the particular circumstances, a denial of the state's power to protect correlative rights in the field or to regulate appellant's taking in the interest of others having equal rights proportionate to their surface holdings. For, though Republic concedes it is bound by Oklahoma's statutory requirement of *pro rata* production, that requirement becomes merely a time factor affecting the rate and length of the period of Republic's drainage, not the total quantity eventually to be taken, if Republic can defy the commission's order and thus leave Peerless in its present helpless condition.

The contention is bold and far reaching, more especially when account is taken of the nature of the industry. Natural gas in place is volatile and fugitive, once a single outlet is opened. When extracted it cannot be stored in quantity, but must be marketed ultimately at burner tips in the time necessary for conveyance to them from the well mouth. The competitive struggle for the industry's rewards is particularly intense in the initial stage of developing a field. By the industry's very nature large outlays of capital are required for successful continuing production and marketing. All those factors however tend toward monopoly once success has been achieved in a particular field.

These peculiar qualities, moreover, have been reflected in the legal rights relating to the ownership of gas in place, as well as its extraction. They have been adapted to its nature and to that of the competitive struggle regarding it. Only a specialist in this branch of the law, which varies from state to state, can undertake to say

with any reliable degree of precision what rights may be in particular situations. These difficulties, intensified by the competitive struggle for the product and the inadequacy of common-law ideas to control it, have forced both the states and the federal government to adopt extensive regulatory measures in recent years. This has been necessary both to conserve the public interest in this rapidly depleting natural resource [24] and to secure fair adjustment of private rights in the industry. Rather than being a sacred, untouchable enclave of the common law, the field by its very nature lends itself especially to governmental intervention for such purposes. In this respect it is hardly comparable to situations comprehending only conventional manufacturers and merchants of consumable goods.

In accordance with Oklahoma's law, appellant does not assert title to the gas in place. It asserts only the right to capture what it can produce. But that right, unqualified, would include the right to take gas from beneath others' lands. So taken, it defies their rights to a proportionate share and the state's power to secure them, if for reasons rendering marketing through their own facilities unfeasible they cannot join in the unrestrained competitive draining.

So far as the federal Constitution is concerned, there is no such unrestricted fee simple in the right to drain gas from beneath an adjacent owner's land. It is far too late, if it ever was otherwise, to urge that the states are impotent to restrict this unfettered race or to put it upon terms of proportionate equality by whatever measures may be reasonably necessary to that end. Indeed our constitutional history is replete with instances where the states have altered and restricted schemes of property

---

[24] Cf. *Power Comm'n* v. *Hope Gas Co.*, 320 U. S. 591, dissenting opinion of MR. JUSTICE JACKSON at 628.

rights in response to the public interest and the states' local needs. In some cases this has gone to the extent of abolishing basic common-law conceptions entirely and substituting new ones indigenous to their areas and the problems they present. Perhaps the most extensive and obvious illustrations are to be found in the systems developed in our arid and mountainous western states for governing rights in the waters of flowing streams and mining rights in respect to precious metals.[25] Others are not lacking.[26]

It hardly can be maintained that the creation and control of rights respecting the ownership, extraction and marketing of natural gas are less broadly subject to state control than those relating to waters for irrigation and other uses or to the extraction of precious metals in the regions where those matters have called into play the states' authority to act in the manner best suited to local conditions and the needs of their inhabitants. The similarities of the situations and the problems, for purposes of constitutionality in the exercise of those powers, are so obvious they do not need to be specified.

Historically, the states' freedom to exercise broad powers in defining and regulating rights of ownership and production of natural gas has been recognized almost as long and quite as completely as their similar freedoms to act in relation to water rights and mining rights. In

---

[25] See *Clark* v. *Nash,* 198 U. S. 361; *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112; *Kansas* v. *Colorado,* 206 U. S. 46, 93–94; *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U. S. 690, 702–703; *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527; *Parley's Park Silver Mining Co.* v. *Kerr,* 130 U. S. 256; *Butte City Water Co.* v. *Baker,* 196 U. S. 119; *Kendall* v. *San Juan Silver Mining Co.,* 144 U. S. 658; *Clason* v. *Matko,* 223 U. S. 646.

[26] *Head* v. *Amoskeag Mfg. Co.,* 113 U. S. 9; *Wurts* v. *Hoagland,* 114 U. S. 606; *Bacon* v. *Walker,* 204 U. S. 311; cf. *Ferry* v. *Spokane, P. & S. R. Co.,* 258 U. S. 314; *Campbell* v. *California,* 200 U. S. 87.

a line of cases beginning a half century ago with *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, this Court has upheld various types of state regulatory schemes designed to prevent waste and to protect the "coequal rights" of the several owners of a common source of supply.[27]  These cases clearly recognize that the state regulation may be justified on alternative grounds, either to prevent waste or to adjust private correlative rights.[28]

It is true, as appellant points out, that none of those cases presented the specific issue of whether the state may adjust correlative rights independently of a conservation program.  But it is not true that this power is merely incidental to the fundamental right of the state to preserve its natural resources.  In fact, if one power were incidental to the other, the *Ohio Oil* case would support the view that waste prevention is justifiable because it serves "the purpose of protecting all the collective owners . . . ." 177 U. S. at 210.[29]  Moreover, it is significant that the opinion in *Bandini Petroleum Co.* v. *Superior Court* specifically states that the California reg-

[27] *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300; *Bandini Petroleum Co.* v. *Superior Court,* 284 U. S. 8; *Champlin Refining Co.* v. *Corporation Commission,* 286 U. S. 210; *Hunter Co.* v. *McHugh,* 320 U. S. 222.

[28] See Hardwicke, The Rule of Capture, 13 Tex. L. Rev. 391, 414–422; Marshall and Meyers, Legal Planning of Petroleum Production, 41 Yale L. J. 33, 48–52; Ely, The Conservation of Oil, 51 Harv. L. Rev. 1209, 1222–1225; Ford, Controlling the Production of Oil, 30 Mich. L. Rev. 1170, 1181, 1192.

[29] Independently of any statute, several states have granted equitable relief against waste in order to protect the correlative rights of common owners of a reservoir of gas or oil.  *Louisville Gas Co.* v. *Kentucky Heating Co.,* 117 Ky. 71; *Manufacturers Gas and Oil Co.* v. *Indiana Natural Gas and Oil Co.,* 155 Ind. 461, 474–475; *Ross* v. *Damm,* 278 Mich. 388; *Higgins Oil & Fuel Co.* v. *Guaranty Oil Co.,* 145 La. 233; *Atkinson* v. *Virginia Oil & Gas Co.,* 72 W. Va. 707.

ulation is valid on its face, even if viewed as a measure designed purely for the protection of correlative rights. 284 U. S. 8, 22.[30]

Oklahoma's power to regulate correlative rights in the Hugoton field therefore does not stem from her interest merely in the preservation of natural resources. It stems rather from the basic aim and authority of any government which seeks to protect the rights of its citizens and to secure a just accommodation of them when they clash.[31] That authority is constantly exercised in our system in relation to other types of property.[32] In view of this

---

[30] The Supreme Court of Texas has recently upheld administrative action designed solely to protect correlative rights. *Corzelius* v. *Harrell*, 143 Tex. 509. Note, 24 Tex. L. Rev. 97.

[31] Oklahoma can prevent agents of Republic from going on Peerless' land by force of arms and there drilling a well and stealing gas. The state's power to prevent larceny and trespass and to enjoin any use of property that creates a nuisance for a neighboring property owner also justifies the regulation of common property for the mutual advantage of its several owners. *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9; *Bacon* v. *Walker*, 204 U. S. 311.

Under certain circumstances a state may compel one individual to surrender private property solely to enable another to exploit the potential resources of his private property. Thus in *Clark* v. *Nash*, 198 U. S. 361, the plaintiff's land could be made productive only by enlarging an irrigation ditch across defendant's land, and in *Strickley* v. *Highland Boy Gold Mining Company*, 200 U. S. 527, the mining company could deliver its ore to market only by constructing an aerial bucket line across defendant's land. Here Peerless can exploit its property only if Republic is compelled to take its gas to market. Moreover, until Peerless is able to produce the gas under its land, this gas will continue to be withdrawn by Republic. In effect Republic is now exploiting Peerless' property.

[32] *E. g.*, *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9; *Wurts* v. *Hoagland*, 114 U. S. 606; *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112; *Bacon* v. *Walker*, 204 U. S. 311; *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531; *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22.

fact and of what has been said concerning conditions
in this industry, it would be incongruous for us to hold
that oil and gas law is the one phase of property law
that cannot be modified except for conservation purposes.
Especially in the light of its origin and development
in a *laissez faire* atmosphere appropriate for fostering in-
tense competitive expansions, see Merrill, The Evolution
of Oil and Gas Law, 13 Miss. L. J. 281, the states should be
allowed certainly not less freedom to evolve new property
rules to keep pace with changing industrial conditions
than they possess in nearly every other branch of the law.[33]
Here as elsewhere, in considering the proper scope for
state experimentation, it is important that we indulge
every reasonable presumption in favor of the states' ac-
tion. They should be free to improve their regulatory
techniques as scientific knowledge advances, for here too
experimentation is the lifeblood of progress. See Mr.
Justice Brandeis dissenting in *New State Ice Co.* v. *Lieb-
mann,* 285 U. S. 262, 280.

## IV.

The remaining narrow issue is whether the most prac-
tical method of achieving a fair accommodation of the

---

[33] "It is submitted that through the judicial and legislative processes
correlative right-duty relations against injury and non-compensated
and preventable drainage do exist, but the difficulty of finding and
proving the facts in a particular situation is such that the usual rem-
edies of damages and injunction might not be practicable. It seems
more advisable that legislatures enact statutes expressly declaring the
existence of these correlative right-duty relations in landowners,
apart from public rights against waste, and authorize an administra-
tive agency, after a finding of facts, to promulgate rules and regula-
tions for their protection and authorize the Commission or private
owners to enforce such rules and regulations through actions in the
courts." Summers, Legal Rights against Drainage of Oil and Gas,
18 Tex. L. Rev. 27, 47.

correlative rights of the parties is invalid because Republic is required to take and to pay for gas that it does not want—at least does not want if it must pay for it.

Appellant relies heavily on *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55, where this Court invalidated an order limiting respondent's production so severely that it would have had to purchase gas from unconnected wells in its vicinity in order to satisfy its commitments. Thus the necessary effect of that order was comparable to the effect of the order under review here.

But there is a crucial difference between the cases. In deciding the *Thompson* case the Court explicitly assumed that the order could be upheld if reasonably designed either to prevent waste or "to prevent undue drainage of gas from the reserves of well owners lacking pipe line connections."[34] Because of a geological anomaly there was a general drainage in the gas field away from the connected wells toward the unconnected wells, 300 U. S. at 71–73, so that the producing wells, rather than draining gas away from the dormant wells, would only reduce their own loss by producing as much as possible. Therefore the limitation on their production could not be justified, since it was neither for the purpose of preventing waste nor a reasonable regulation of correlative rights. Instead of protecting one party from loss, it operated to aggravate the effect of the drainage away from the owners of connected wells. They suffered, not only by an increased drainage loss, but also by the consequence that they were forced to share their facilities and market with the very parties who profited by their loss. The Court held that such an order requiring one company to share its market with another was unconstitutional inasmuch

---

[34] 300 U. S. at 76–77. This assumption is repeated several times in the opinion. See 300 U. S. at 58, 67, 69 and 72–73.

as it was not justified either as a conservation measure or as a reasonable adjustment of correlative rights. The latter justification is present in this case.

The fact that Republic is compelled either to purchase Peerless' gas or to carry it to market and account for the profits does not make the regulation unreasonable. If that were the sole cause for complaint, the state could take the more drastic step of requiring all the well owners to shut down completely until all were able to produce on a ratable basis or came to some agreement effective to make this possible. It is clearly within the state's power to require Republic to compensate Peerless for the gas drained from under the Peerless land. *Patterson* v. *Stanolind Co.*, 305 U. S. 376. Here, instead of requiring Republic to make a cash payment based on the estimated amount of drainage, the commission has selected what is unquestionably a more accurate method of adjusting the correlative rights. Even if it could be assumed that this method imposed a somewhat heavier burden on Republic than possible alternatives, it does not follow that the method selected by the commission is unconstitutional. For we have constantly recognized the propriety of allowing wide discretion to the administrative agencies who are best qualified to select the most reasonable solutions to the thorny problems that accompany regulation in this highly technical field. *Railroad Commission* v. *Rowan & Nichols Oil Co.*, 310 U. S. 573. Keeping in mind the fact that property law is peculiarly a matter of local concern, the special difficulty of defining and regulating property rights in natural gas, the respect due to experts in this field, and the rather unusual facts this record presents, I cannot say that the state is without power to enter this order.

It is suggested that the order, since it includes the requirement of purchase and not merely of transportation

and accounting for profits, becomes invalid because it shifts from Peerless to Republic the business risk incident to ownership and sale of the gas. Possibly this might furnish a more serious basis for objection in materially different circumstances. But, apart from what has already been said, in those now presented I conceive no substantially greater harm to be possible, from the order's operation, than depriving Republic of the right to drain gas from beneath Peerless' lease without liability to pay for the gas so drained.

This assumes that if the parties should be unable to agree upon terms the commission will fix them in a manner taking due account of prevailing market conditions relevant to the price to be paid, as well as reasonable compensation for the use of Republic's facilities. With those limitations properly applied, it is hard to see what great business risk will be shifted to Republic. For, as we have already noted, the commodity is one not subject to storage, must be sold as soon as it is transported to the point of consumption, and therefore cannot be subject to possible wide fluctuation in selling price between the times of purchase and sale by Republic.

The facts here, it seems to me, justify the commission's action. Whether others materially different may do so should be left to be considered when they arise.

I would affirm the judgment of the Supreme Court of Oklahoma.