YORKSHIRE INV. & AMERICAN MORTG. CO., Limited, v. FOWLER et al.

(Circuit Court of Appeals, Second Circuit. January 22, 1897.)

PRINCIPAL AND AGENT—FIDUCIARY RELATION—MORTGAGE INVESTMENT AND GUARANTY CONTRACT—INSOLVENCY.

The J. Co., which was engaged in the United States in the business of loaning money on real-estate mortgages, and selling such mortgages, and the Y. Co., which was engaged in England in the business of investing money in such mortgages, and selling its debentures, entered into a contract by which it was agreed that the J. Co. should guaranty the payment of a certain rate of interest on all mortgages sold to the Y. Co., and also on the cash balances of

the Y. Co. in the hands of the J. Co., and on all sums advanced by the Y. Co. for the purchase of mortgages, as soon as received by the J. Co. The J. Co. also guarantied the payment of the principal of the mortgages sold to the Y. Co., within two years after maturity. The J. Co. was to have the right to substitute new securities, from time to time, for those sold to the Y. Co., and the Y. Co. might refuse any mortgage not deemed good. The J. Co. reserved the right to terminate the contract on 60 days' notice. Under this contract the Y. Co. remitted funds from time to time to the J. Co., and sent to it the maturing mortgages; being credited with such funds and with the face of the mortgages, and interest being paid on its balances, which were sometimes large. The J. Co. forwarded mortgages to the Y. Co. at its convenience,—sometimes when not in funds from the Y. Co. The mortgages were all made to the J. Co., and assigned to the Y. Co. The J. Co. kept no separate investment account for the Y. Co., but mingled the funds received from it with its other funds. The Y. Co. never inquired about the specific investment of its funds, nor about the payment of the mortgages, and did not attempt to instruct or control the J. Co. in respect to the investments. *Held,* that the relation between the two companies was not fiduciary, but merely that of debtor and creditor, and the Y. Co. was not entitled, upon the insolvency of the J. Co., to a preference in payment of the balance due it, as a trust fund in the hands of the J. Co. for investment as the agent of the Y. Co. Brown, District Judge, considered the Y. Co. entitled to the returned mortgages remaining on hand and in statu quo at the time of the receivership, and to the proceeds thereof collected by the receivers.

Appeal from the Circuit Court of the United States for the Southern District of New York.

George S. Coleman, John C. F. Gardner, and Harrie M. Humphreys, for appellant.

Arthur H. Masten and Edward Van Ingen, for appellees.

Before WALLACE and SHIPMAN, Circuit Judges, and BROWN, District Judge.

WALLACE, Circuit Judge. On the 28th day of September, 1893, an action was commenced in the circuit court of the United States for the Southern district of New York by Benjamin N. Fowler and others against the Jarvis-Conklin Mortgage Trust Company, for the administration of the estate of the insolvent defendant, and for the appointment of receivers of its property and assets; and upon that day receivers were appointed, who took possession of the property and assets, and proceeded to execute their trust. Subsequently the Yorkshire Investment & American Mortgage Company filed a proof of claim against the insolvent company for the sum of $155,947.48, insisting that, to the extent of that claim, they were entitled to a preference over the other creditors of the insolvent company, upon the theory of an equitable lien. The receivers filed their objections to the claim, admitting that the insolvent corporation was indebted in the sum stated, but denying that the claim was entitled to any preference over the claims of the general creditors. The issue thus raised was referred by the court to a special master. The master reported against the claim, and the exceptions to his report filed by the claimant were overruled by the court. The report of the master contains a careful summary of the facts in the case, and a very satisfactory presentation of the legal principles involved, and was adopted by the circuit

court without any further opinion. From the order overruling those exceptions, and adjudging that the claimant was not entitled to the preference, the claimant has appealed. This order is, in effect, a final decree upon matters distinct from the general subject of litigation involved in the original action, and may therefore be reviewed, although the original action may not have proceeded to a final decree. Trustees v. Greenough, 105 U. S. 527; Central Trust Co. v. Grant Locomotive Works, 135 U. S. 224, 10 Sup. Ct. 736.

The theory of the lien claimed by the investment company is that the sum of $155,947.48 consisted of moneys belonging to it which were a trust fund in the hands of the insolvent corporation, being the proceeds of securities intrusted to that corporation for collection, and moneys which had been placed in its hands to invest in securities as an agent.

A careful study of the evidence in the record has satisfied us that whatever may have been the character of the relations between the parties prior to the 1st day of January, 1888, after that time they were not fiduciary, and, as to the moneys in the hands of the Jarvis-Conklin Company, they were those of ordinary debtor and creditor. Prior to that time the two corporations had been dealing together in bonds and mortgages. The Jarvis-Conklin Company was engaged in the business of loaning money upon bond and mortgage on lands in the western portion of the United States, and selling the bonds and mortgages to purchasers; and the Yorkshire Company had been investing its money in the purchase of these bonds and mortgages, and selling its own debentures. The business between the two corporations had assumed large proportions. January 1, 1888, the two corporations entered into a written contract, wherein the Jarvis-Conklin Company was named as the party of the first part, and the Yorkshire Company as the party of the second part, which was as follows:

"This agreement * * * * * * * * * * *

"Witnesseth, that first party and its predecessors, Jarvis-Conklin & Company, have prior hereto sold to second party coupon bonds secured by mortgages and deeds of trust which are first liens upon real estate lying in the said state of Kansas and other states, and said parties are desirous that first party shall continue to sell and assign, and second party to purchase, such bonds, mortgages, and deeds of trust:

"Now, therefore, for and in consideration of the mutual covenants herein contained, as well as for other good and valuable consideration, the said parties agree as follows:

"First, party guaranties to second party the payment of principal and interest upon all bonds, mortgages, and deeds of trust, as well upon all such as are now owned by second party and sold to it in the past, as hereinbefore set forth, as upon all such as shall be in the future, and during the continuance of this contract, sold by the first party to second party.

"The interest which the first party guaranties is at the rate of six and two-thirds per cent. per annum, payable semiannually on the first days of January and July in each year, notwithstanding the rate of interest provided to be paid by the bonds, mortgages, or deeds of trust may be at a different rate.

"First party guaranties the payment to second party of interest at the rate of six and two-thirds per cent. per annum upon all cash balances in favor of second party in the hands of first party at the date of this contract (January 1, 1888); and hereafter the payments of interest which second party shall receive on bonds,

mortgages, and deeds of trust sold them as hereinbefore provided shall be so paid that second party shall receive interest at the rate of six and two-thirds per cent. per annum upon all sums of money advanced for the purchase of such bonds, mortgages, and deeds of trust, from the date that such money is received by first party at the office of London and Westminster Bank, Limited, Lothbury, E. C., London, England.

"The guaranty herein made by first party as to the principal sum of said bonds, mortgages, and deeds of trust is that the same shall be paid within two years from the maturity thereof; and second party waives all demand, notice, and protest.

"This guaranty shall not extend to any remittances made after the expiration of sixty days from the mailing by first party to second party, postage prepaid, at its address, 48 Market street, Bradford, England, a written notice that first party will not receive any further moneys on the above terms.

"First party shall have the privilege at any time of substituting other securities in place of those owned by second party, or renewing any loan owned by second party, provided second party shall be satisfied such substituted securities or renewals are of equal value with those for which they are exchanged.

"Second party shall at all times have the privilege of refusing any mortgages or deeds of trust which are, in its judgment, not sufficient or suitable security.

"This agreement shall be in force and effect from the date hereof to December 31, 1889; but the termination of this contract at that date shall not be so construed as to invalidate the guaranty herein made for the payment of principal and interest maturing after December 31, 1889."

Before the expiration of the year during which this contract was to continue, it was extended, with some slight modifications, for an indefinite period. Such extension agreement, so far as is material, was as follows:

"It is therefore further agreed between the Jarvis-Conklin Mortgage Trust Company of Missouri, of the first part, and the Yorkshire Investment and American Mortgage Company, Limited, of the second part, that said contract shall be continued in full force and effect, as to all its provisions, from the date hereof until such time as it shall be terminated by agreement, except that, on all money advanced after this date by second party under said contract, first party shall pay and guaranty a different rate of interest from that named in said contract, as follows:

"On the first £100,000 at the rate of six and two-thirds per cent., on the second £100,000 at the rate of six and one-third per cent., and on all further sums at the rate of six per cent., per annum."

No notice of termination was ever given, and these contracts were in force when receivers of the Jarvis-Conklin Company were appointed, on September 28, 1893. No other contracts, written or oral, were ever made between the two companies.

Under these contracts the course of business pursued by the parties was as follows:

The Yorkshire Company, from time to time, as it saw fit, would remit funds to the Jarvis-Conklin Company, without inquiry as to whether the latter had mortgages on hand for sale; and, as mortgages which it had bought were about to mature, it would send them to the Jarvis-Conklin Company. The advances, and the face of the maturing mortgages, would be at once credited, in the account between the parties, to the Yorkshire Company. The Jarvis-Conklin Company would, from time to time, send mortgages to the Yorkshire Company. These mortgages were all executed by the makers to the Jarvis-Conklin Company, and were accompanied by assignments from that company to the Yorkshire Company, and the great majority of them ranged in amount from $300 to $800.

Sometimes they were sent when the Jarvis-Conklin Company was not in funds from the Yorkshire Company, and in anticipation of receiving funds. Sometimes they were sent to fill orders for a specified amount from the Yorkshire Company. Sometimes, instead of new mortgages, the Jarvis-Conklin Company sent extensions of the time of payment of matured or maturing mortgages,—always without any consultation with the Yorkshire Company. As the securities were forwarded, the Jarvis-Conklin Company was credited in the account with their amount. The interest account between the two corporations was always adjusted so that the Yorkshire Company received the contract rate upon its balance of account.

The Jarvis-Conklin Company kept no separate investment account of the funds received from the Yorkshire Company, but mingled the funds with its general funds, and used them indiscriminately. No inquiry was ever made by the Yorkshire Company whether the matured mortgages were paid or not. At times there would be a large balance to the credit of the Yorkshire Company remaining for long periods. In 1891 there was a balance for several months of about $250,000. In the summer of 1893 there was a balance of about $450,000. On only two occasions were moneys sent by the Jarvis-Conklin Company to the Yorkshire Company, and on these occasions, although there was a much larger balance to the credit of the Yorkshire Company, the remittances were treated as made for the accommodation of the latter. Throughout the correspondence that took place during this period of five years, there were no instructions from the Yorkshire Company to the Jarvis-Conklin Company, or consultations, about specific investments, or anything indicating that the Yorkshire Company expected the Jarvis-Conklin Company to discharge any of the ordinary duties of an agent for investing its funds. There is not a scintilla of evidence in the record to indicate any understanding that the Jarvis-Conklin Company should use the moneys of the Yorkshire Company for investment in securities specifically intended for that company. The Jarvis-Conklin Company received no salary or commissions, and had no power of attorney, or written or oral authorization defining its duties or regulating its conduct towards the Yorkshire Company in any way.

These facts are wholly inconsistent with the theory that the Jarvis-Conklin Company was an agent for the Yorkshire Company. In a general sense, it was investing the funds of the Yorkshire Company. In doing this, however, it undertook no duty of fidelity towards the Yorkshire Company. The risks and the profits were its own. The contract implied that the Jarvis-Conklin Company would receive all the moneys the Yorkshire Company might advance, whatever their amount might be, and pay interest upon them, and its only protection from being overburdened was that afforded by the 60-days clause. The course of dealing between the two corporations, as well as the contract, contemplated that the Yorkshire Company should accept all mortgages the Jarvis-Conklin Company should see fit to send, to the extent of the moneys advanced by the Yorkshire Company, provided only they were good securities.

The Jarvis-Conklin Company did not undertake to procure mortgages for the Yorkshire Company in any particular time, but the contract implied that it would do so within a reasonable time; and it was obviously desirable for it to do so speedily, and thereby save the running of interest.

The case is one where an intending purchaser of securities advances money to the intending seller, not expecting to receive any particular securities, but to obtain such of a satisfactory character as the seller, from time to time, may elect to provide. Can it be doubted that the title to the money vests in the vendor as soon as as he receives it, or that his only obligation to the vendee is to provide the securities within a reasonable time?

It is absurd to suppose that the Yorkshire Company did not understand that the Jarvis-Conklin Company was using the fund for its own benefit, or that it believed that the Jarvis-Conklin Company was allowing the large balances in its hands to lie idle for the long periods of time upon which it was paying interest upon them.

The long-continued practice between the two companies, when matured mortgages were sent by the Yorkshire Company to the Jarvis-Conklin Company, of treating them as cash items in the account, and covering the amount with new mortgages, imports an understanding that they were to be regarded as sent for the purpose of being exchanged for new ones, and as representing money advanced. It was a matter of indifference to the Yorkshire Company whether they were collected or not. The Jarvis-Conklin Company was under no obligation to charge itself with the principal of these mortgages until the expiration of two years after their maturity, but when it did so, and when its action was assented to by the Yorkshire Company, it could not retract. The legal effect was to invest the Jarvis-Conklin Company with the title to the securities, and create the relation of debtor and creditor between the two corporations for their amount. We conclude that, as to the entire account between the two corporations, their relation was merely that of ordinary debtor and creditor.

It follows that the decree of the court below was right, and it is therefore affirmed, with costs.

BROWN, District Judge. I concur in the decision of this cause, except as regards the item of $24,385.88, a part of the amount claimed. These moneys were collected by the receivers of the Jarvis-Conklin Company after their appointment on September 28, 1893, from certain matured mortgages which had been previously forwarded by the Yorkshire Company to the Jarvis-Conklin Company for collection and payment.

These returned mortgages remained in statu quo at the time the receivers were appointed. They had not been collected by the Jarvis-Conklin Company, nor had that company either paid any part of them to the Yorkshire Company, or forwarded any other mortgages in place of them. Payment of the mortgages was guarantied by the Jarvis-Conklin Company. I do not perceive anything

in the case sufficient to extinguish that guaranty, or to take away the title of the Yorkshire Company to such of their returned and guarantied mortgages as remained in statu quo at the time the receivers were appointed. In a mortgage account kept by the Jarvis-Conklin Company these mortgages were credited to the Yorkshire Company at their face amounts as soon as received; and other mortgages when sent to the Yorkshire Company were debited. This, in my judgment, was not equivalent to turning the mortgages into cash, so as to bring those mortgage credits within the words "cash balances," in the other clause of the agreement, and thus to discharge the guaranty and take away the Yorkshire Company's title to the mortgages. The mortgage credit in the mortgage account, was, I think, merely an indispensable bookkeeping entry as to the status of the mortgage account, and of no significance as regards the guaranty, or the continued title of the Yorkshire Company, until the returned mortgages were either paid or collected by the Jarvis-Conklin Company, or new mortgages substituted therefor.