711 F.2d 441
 8 Collier Bankr.Cas.2d 1093, 10 Bankr.Ct.Dec. 1263,
Bankr. L. Rep. P 69,265,
4 Employee Benefits Cas. 1919
 In re SACO LOCAL DEVELOPMENT CORP., Leather Comfort
Corporation, Kirstein Leather Co., d/b/a Saco
Tanning Corp., Kirstein Split
Corporation, Debtors.
Roderick R. Rovzar, Trustee, Appellant.
 No. 82-1798.
 United States Court of Appeals,
First Circuit.
 Argued March 11, 1983.
Decided June 27, 1983.
 
 Charles E. Miller, with whom Gregory A. Tselikis, and Bernstein, Shur, Sawyer & Nelson were on brief, for appellant.
 Peter S. Plumb, with whom Clark C. Hambley, Jr., and Murray, Plumb & Murray were on brief, for appellee Northwestern National Life Ins. Co.
 Linwood Holton, Joe W. Peel, R. Otto Meletzke, and John R. Hurley on brief for the American Council of Life Ins. and Health Ins. Ass'n of America, amicus curiae.
 Before COFFIN, Chief Judge, BREYER, Circuit Judge, and MALETZ,* Senior Judge.
 BREYER, Circuit Judge.
 
 
 1
 The trustee in bankruptcy of Saco Local Development Corporation and several related entities ("Saco") appeals from a bankruptcy court ruling that Northwestern Life Insurance Co. is entitled to priority payment of Saco employee group life, health, and disability insurance premiums. The bankruptcy court found that these payments fit squarely within the language of 11 U.S.C. § 507(a)(4), which grants a priority to "unsecured claims for contributions to employee benefit plans." We affirm.
 
 
 2
 * The most difficult question that this case raises is whether we have jurisdiction over this appeal. The parties have agreed to appeal the priority order directly to this court. And, under the governing act, the Bankruptcy Reform Act of 1978, courts of appeals have jurisdiction over appeals "from a final judgment, order, or decree of a bankruptcy court ... if the parties to such an appeal agree to a direct appeal to the court of appeals." 28 U.S.C. § 1293(b). The 1978 Act's transition provisions make § 1293(b) applicable during the bankruptcy transition period from 1979 to 1984, as well as thereafter. See Pub.L. No. 95-598, § 405(c), 92 Stat. 2549, 2685 (1978), reprinted in 28 U.S.C.A. note preceding § 1471 (West Supp.1982). Since this provision limits our jurisdiction to "final" judgments, orders, and decrees, see Maiorino v. Branford Savings Bank, 691 F.2d 89 (2d Cir.1982); In re Callister, 673 F.2d 305 (10th Cir.1982) (per curiam ); In re Kutner, 656 F.2d 1107 (5th Cir.1981), cert. denied sub nom. Stewart v. Kutner, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), we must decide if the order before us is "final."
 
 
 3
 In this case, Northwestern filed a claim with the trustee for roughly $106,000 in unpaid premiums for Saco employee group life, health, and disability insurance. The bankruptcy court agreed with Northwestern that these premiums deserved priority status under § 507(a)(4). However, the court did not determine how much of the $106,000 claim would receive priority treatment. The amount of the priority is limited to $2,000 per employee, less amounts paid as wage priorities under § 507(a)(3). 11 U.S.C. § 507(a)(4)(B). The bankruptcy court stated that on the record before it, it was "unable to determine if this limitation will affect the claim of Northwestern." In re Saco Local Development Corp., 23 B.R. 644, 648 (Bkrtcy.D.Me.1982). The Trustee and Northwestern agreed to seek immediate review of the order by this court notwithstanding this unresolved issue.
 
 
 4
 The bankruptcy court's order obviously is a "final" determination of Northwestern's claim to a § 507(a)(4) priority. But, to decide whether it is a "final judgment, order, or decree" within the meaning of § 1293(b), we must consider two respects in which it is arguably not final, namely the fact that it is only a small part of the overall Saco liquidation proceedings, and the fact that the order does not determine how much of Northwestern's dollar claim will receive priority treatment. We consider each of these points in turn.
 
 A.
 
 5
 Were this not a bankruptcy case, we doubt that the kind of order before us would be considered "final." Traditionally, every civil action in a federal court has been viewed as a "single judicial unit," from which only one appeal would lie. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 54.19 (1982). Ordinarily, putting aside the effect of Fed.R.Civ.P. 54(b), an action remains a "single judicial unit" even when it contains multiple claims and multiple parties. Id. p 54.19, at 212; see Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 431-32 & n. 3, 76 S.Ct. 895, 897 & n. 3, 100 L.Ed. 1297 (1956); Republic of China v. American Express Co., 190 F.2d 334 (2d Cir.1951). As a result, an order that effectively disposes of a claim by one plaintiff against one defendant normally, although not invariably, is regarded as interlocutory as long as the other claims remain unsettled.
 
 
 6
 Moreover, because of the "single judicial unit" rule, orders in non-bankruptcy cases that recognized one plaintiff's claim without resolving other plaintiffs' claims have been treated as interlocutory whenever the amount of the first plaintiff's recovery depended on the size of the remaining plaintiffs' damages. Compare Arnold v. United States ex rel. W.B. Guimarin & Co., 263 U.S. 427, 44 S.Ct. 144, 68 L.Ed. 371 (1923), and Parsons v. Robinson, 122 U.S. 112, 7 S.Ct. 1153, 30 L.Ed. 1122 (1887), with Clark v. Williard, 292 U.S. 112, 54 S.Ct. 615, 78 L.Ed. 1160 (1934), and Gumbel v. Pitkin, 113 U.S. 545, 5 S.Ct. 616, 28 L.Ed. 1128 (1885), and Royal Indemnity Co. v. Woodbury Granite Co., 101 F.2d 689 (D.C.Cir.1938), cert. granted, 306 U.S. 627, 59 S.Ct. 645, 83 L.Ed. 1030 dismissed by stipulation, 308 U.S. 628, 60 S.Ct. 63, 84 L.Ed. 524 (1939). In Arnold, for example, the Supreme Court ruled that a Court of Appeals order which confirmed one subcontractor's claim against a contractor's bond, but required the district court to determine the validity of other creditors' claims against the bond, was not final. The Court recognized that the order settled the validity and amount of the subcontractor's claim, but held that it was not final because it
 
 
 7
 does not determine the ultimate amount which [the plaintiff] may recover on the bond, the amounts which the intervening creditors may recover, or the amount of the ultimate liability of the defendants on the bond; it adjudicates neither the amount of the claims which are to be finally allowed against the fund created by the bond, nor the proportionate share of each creditor in such fund if inadequate to pay the amounts due all the creditors.
 
 
 8
 263 U.S. at 433, 44 S.Ct. at 147. The Court reached a similar result in Parsons, a mortgage bond foreclosure case. The Court there held that a district court decree establishing the validity and amount of bondholders' claims and confirming their right of foreclosure was not final because, inter alia, the district court had not yet determined the extent of any senior liens on the mortgaged property. See also Smith v. Sherman, 349 F.2d 547 (9th Cir.1965) (interpleader action). But see Gripton v. Richardson, 82 F.2d 313 (9th Cir.1936) (receivership); Yorkshire Investment & American Mortgage Co. v. Fowler, 78 F. 56 (2d Cir.1897) (same). If bankruptcy proceedings were to be treated like other federal cases subject to the "single judicial unit" rule employed in Arnold and Parsons, an order allowing or disallowing a claim or priority would not be "final"; the dispute over Northwestern's claim would not constitute a complete "judicial unit," for its ultimate resolution depends on unresolved claims by other creditors in the same litigation.
 
 
 9
 Although Congress has defined appellate bankruptcy jurisdiction in terms ("final judgment, order, or decree") similar to those appearing in other jurisdictional statutes, see, e.g., 28 U.S.C. §§ 1257, 1291, the history of prior federal bankruptcy law and the 1978 Act convinces us that Congress did not intend the word "final" here to have the same meaning--at least not with respect to the application of the traditional "single judicial unit" rule. We note first that departures from that rule are not without precedent. Congress and the courts have recognized in other contexts that complex multi-party litigation may involve many discrete controversies, each of which may stand sufficiently apart from the rest of the litigation to warrant treating an order which resolves it as "final" and appealable. See Swift & Co. Packers v. Compania Colombiana del Caribe, S.A., 339 U.S. 684, 689, 70 S.Ct. 861, 865, 94 L.Ed. 1206 (1950) (Frankfurter, J.) ("claim[s] fairly severable from the context of a larger litigious process"). Thus, Rule 54(b) of the Federal Rules of Civil Procedure modified the "single judicial unit" rule in civil proceedings generally by allowing a district court to enter an appealable final order "as to one or more but fewer than all of the claims or parties" in a multi-claim or multi-party suit. See Sears, Roebuck & Co. v. Mackey, 351 U.S. at 434, 437-38, 76 S.Ct. at 899, 900-01.
 
 
 10
 More significantly for present purposes, Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case--and in particular, it has long provided that orders finally settling creditors' claims are separately appealable. The first federal bankruptcy acts, enacted in 1800 and 1841, made no specific provision for appeals. 2 Collier on Bankruptcy p 24.02, at 695 (14th ed. 1976) [hereinafter cited as Collier ]. The 1867 Bankruptcy Act, however, expressly created appellate jurisdiction over orders allowing or disallowing claims. Under § 8 of the 1867 Act, "any supposed creditor whose claim is wholly or in part rejected, or an assignee who is dissatisfied with the allowance of a claim," was allowed to appeal the decision to a circuit court (or, following the Evarts Act in 1891, to a Court of Appeals). Bankruptcy Act of 1867, § 8, 14 Stat. 517, 520, reprinted in 10 Collier app. 1750; see Morgan v. Thornhill, 78 U.S. (11 Wall.) 65, 76, 20 L.Ed. 60 (1870); Duff v. Carrier, 55 F. 433 (3d Cir.1893).
 
 
 11
 The Bankruptcy Act of 1898 retained direct appellate review over orders allowing or disallowing claims, both before and after its jurisdictional provisions were amended in 1938. As originally enacted, the 1898 Act gave Courts of Appeals jurisdiction over all orders--both final and interlocutory--in "proceedings" in bankruptcy. Bankruptcy Act of 1898, § 24b, 30 Stat. 544, 553, reprinted in 10 Collier app. 1799-1800. A "proceeding" was not the overall liquidation or reorganization, but rather an individual "matter[ ] of an administrative character ... presented in the ordinary course of the administration of the bankrupt's estate." Taylor v. Voss, 271 U.S. 176, 181, 46 S.Ct. 461, 463, 70 L.Ed. 889 (1926) (emphasis added). As a result, any dispute between a bankrupt and his creditors over a claim or priority was a separate "proceeding," and an order settling such a dispute was appealable. See, e.g., Tefft, Weller & Co. v. Munsuri, 222 U.S. 114, 118, 32 S.Ct. 67, 69, 56 L.Ed. 118 (1911); Broders v. Lage, 25 F.2d 288, 289 (8th Cir.1928); In re Breyer Printing Co., 216 F. 878, 880 (7th Cir.), cert. denied sub nom. Borland v. Central Trust Co., 235 U.S. 701, 35 S.Ct. 203, 59 L.Ed. 432 (1914); Morehouse v. Pacific Hardware & Steel Co., 177 F. 337, 340 (9th Cir.1910). The value of immediate appellate review was thought to be so great that, while most appeals from orders in bankruptcy "proceedings" could only be heard by leave of the Courts of Appeals, see 2 Collier p 24.03, at 701, litigants were given an appeal of right "from a judgment allowing or rejecting a claim" worth $500 or more. Bankruptcy Act of 1898, § 25a(3), 30 Stat. 544, 553, reprinted in 10 Collier app. 1800; see Duryea Power Co. v. Sternbergh, 218 U.S. 299, 31 S.Ct. 25, 54 L.Ed. 1047 (1910) (Holmes, J.); Federal Housing Administrator v. Moore, 90 F.2d 32 (9th Cir.1937). The 1938 amendments to the 1898 Act did not affect the appealability of orders allowing or disallowing claims or priorities. See 11 U.S.C. § 47a (repealed 1978); Cope v. Aetna Finance Co., 412 F.2d 635, 638-39 & n. 9 (1st Cir.1969); Lesser v. Migden, 328 F.2d 47, 48-49 (2d Cir.1964); 2 Collier p 24.19, at 746. At no point did the 1898 Act require Courts of Appeals to focus on whether such orders were "final" or "interlocutory," since the Act granted appellate jurisdiction over both types of orders in bankruptcy "proceedings."
 
 
 12
 Although Congress changed the language of the relevant statutes in 1978, the legislative history of the 1978 Act gives us no reason for believing that Congress wished to change this jurisdictional tradition. As introduced and initially enacted, the relevant bills in the House and Senate provided for appellate review of all "final judgments, orders, and decrees ... in proceedings arising under title 11 or arising under or related to cases under title 11." H.R. 8200, 95th Cong., 1st Sess. § 238 (1977); S. 2266, 95th Cong., 2d Sess. § 216 (1978). By referring specifically to "proceedings," which were defined to include all "contested matters, adversary proceedings, and plenary suits," see H.R.Rep. No. 595, 95th Cong., 1st Sess. 444 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 153 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6399, these bills strongly suggest that the relevant "judicial unit" was to remain the traditional "proceeding" within the overall bankruptcy case, not the overall case itself. On this interpretation, supported by the history of past bankruptcy acts, there would have been no need to use the word "interlocutory" in order to preserve the appealability of orders like the present one. The reference to "proceedings arising under title 11" was ultimately dropped from the jurisdictional provisions of the 1978 Act, see 28 U.S.C. §§ 1293(b), 1334(b), 1482(b), but nothing in the legislative history suggests that this omission was intended to change the scope of the relevant "judicial unit." The legislative disagreement between the House and Senate that led to the eventual jurisdictional compromise concerned which courts would first hear appeals, not what types of decisions would be appealable. Compare H.R. 8200, 95th Cong., 1st Sess. § 238 (1977) (vesting appellate jurisdiction in Courts of Appeals), with S. 2266, 95th Cong., 2d Sess. § 216 (1978) (vesting appellate jurisdiction in district courts).
 
 
 13
 In sum, given a longstanding Congressional policy of appealability, an uninterrupted tradition of judicial interpretation in which courts have viewed a "proceeding" within a bankruptcy case as the relevant "judicial unit" for purposes of finality, and a legislative history that is consistent with this tradition, we conclude that a "final judgment, order, or decree" under 28 U.S.C. § 1293(b) includes an order that conclusively determines a separable dispute over a creditor's claim or priority.
 
 B.
 
 14
 We must still determine whether the order at issue here did conclusively determine the priority dispute, or whether it is not "final" because it does not establish how much of Northwestern's claim will actually receive a § 507(a)(4) priority. Again, if bankruptcy cases were to be treated precisely like non-bankruptcy cases, the argument for "nonfinality" would be strong, although not conclusive. In the ordinary non-bankruptcy case, an order that merely determines liability without settling the amount of damages is universally regarded as interlocutory, since it in no way disposes of the controversy between the parties. E.g., Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976); Republic Natural Gas Co. v. Oklahoma, 334 U.S. 62, 63, 66, 68 S.Ct. 972, 974, 975, 92 L.Ed. 1212 (1948); In re Cross, 666 F.2d 873, 878-79 (5th Cir.1982); Garzaro v. University of Puerto Rico, 575 F.2d 335, 337 (1st Cir.1978); Haverhill Gazette Co. v. Union Leader Co., 333 F.2d 798, 803 (1st Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); 9 Moore's Federal Practice p 110.11, at 138; 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3915, at 592 (1976). And, when Congress has found it desirable to allow appellate review of such an order, it has done so by expressly departing from the requirement of finality. See 28 U.S.C. §§ 1292(a)(3), 1292(c)(2); DiBella v. United States, 369 U.S. 121, 124-25, 82 S.Ct. 654, 656-57, 7 L.Ed.2d 614 (1962); Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc., 463 F.2d 101, 102-03 (2d Cir.) (Friendly, J.), cert. denied, 409 U.S. 1040, 93 S.Ct. 523, 34 L.Ed.2d 489 (1972). On the other hand, orders in ordinary cases that effectively settle a controversy and merely leave the court with ministerial or mechanical tasks concerning damages are normally viewed as final, even if a precise damage figure has not been committed to paper. E.g., United States v. Hughes, 585 F.2d 284, 286 (7th Cir.1978); Caradelis v. Refineria Panama, S.A., 384 F.2d 589, 591 (5th Cir.1967) (dictum); Durkin v. Mason & Dixon Lines, Inc., 202 F.2d 425 (6th Cir.1953) (per curiam ); cf. Knox National Loan Association v. Phillips, 300 U.S. 194, 197-98, 57 S.Ct. 418, 419-20, 81 L.Ed. 599 (1937).
 
 
 15
 The present order does not settle the entire dispute between the trustee and Northwestern; it leaves open the question of how much of the claim will be entitled to the priority. It is even conceivable that if a large enough wage claim is recognized under § 507(a)(3), none of Northwestern's claim would be entitled to the § 507(a)(4) priority and the current dispute would become moot. On the other hand, the priority determination appears to rest almost entirely on the outcome of litigation between the trustee and third parties, rather than further litigation involving Northwestern. In particular, the only impediment to fixing the amount of the claim entitled to the § 507(a)(4) priority is the need to determine the extent of any valid § 507(a)(3) wage priority claims. Once the § 507(a)(3) determination is made, setting the § 507(a)(4) figure will be purely mechanical. In short, the order does not leave the court with only ministerial steps to determine the exact amount of the priority, but it appears to leave Northwestern with nothing more to do than await the outcome of third-party litigation.
 
 
 16
 The few cases that we have been able to find which address the finality of such an order in a non-bankruptcy context are divided. The leading case holding an analogous order non-final is Guarantee Co. v. Mechanics' Savings Bank & Trust Co., 173 U.S. 582, 19 S.Ct. 551, 43 L.Ed. 818 (1899). In Guarantee Co., a bank sued an insurance company to recover on an insurance bond issued to protect the bank against embezzlement by a bank employee. The trial court entered judgment for the bank for the full amount of the embezzlement, but deferred execution of the judgment pending the conclusion of litigation by the bank against the employee's estate. The trial court ruled that the insurance company was only secondarily liable, and that its liability would be reduced by whatever amount the bank collected from the employee. The court's order stated that "the decree against defendant company is final as fixing its liability on the bonds to make good the shortage, whatever that may be." The Supreme Court held that the order was not final:
 
 
 17
 [T]he liability of the defendant company was held to be secondary to that of [the employee's] estate which was in course of administration .... In effect, the Circuit Court only determined that ... the Guarantee Company was liable on its bonds for such sum as might thereafter be found to be due after crediting the amounts that might be realized from the assets turned over to the plaintiff bank by [the employee].... [I]t remained for the Circuit Court by proper orders to accomplish the object of the suit, namely, to ascertain the amount for which the plaintiff was entitled to judgment and execution. When that amount is judicially ascertained and fixed by a final decree, the adjudication will be completed for all the purposes of an appeal ....
 
 
 18
 173 U.S. at 585-86, 19 S.Ct. at 552. Accord City of Louisa v. Levi, 140 F.2d 512 (6th Cir.1944). The factual situation in Guarantee Co. is, in effect, the mirror image of that in this case: the extent of one defendant's liability was limited by the "prior" liability of another defendant, rather than the claim of one plaintiff being limited by the "prior" claim of another plaintiff.
 
 
 19
 More recently, an apparently contrary result was reached in Hattersley v. Bollt, 512 F.2d 209 (3d Cir.1975). In Hattersley, a district court found that a building owner, Bollt, was liable to a worker, Hattersley, for injuries sustained in an accident, and further found that Bollt had a limited right of contribution against the subcontractor, Lazovitz, who employed the worker. The court entered a judgment of $500,000 against Bollt, and ordered Lazovitz to pay Bollt any amount that Bollt had to pay Hattersley in excess of $250,000. The Court of Appeals held the contribution order final even though the amount that Lazovitz would have to pay depended on how much Hattersley collected from Bollt:
 
 
 20
 This judgment does not, in terms, assess the precise monetary amount owed by Lazovitz to Bollt. Moreover, it conditions Bollt's right to payment from Lazovitz on Bollt's prior payment of the judgment to the Hattersleys. Nevertheless, because the judgment fixes Lazovitz's ultimate liability and clearly established the parameters of that liability, it is a final, appealable order.
 
 
 21
 ... Since the effect of this district court judgment settles "the primary issue then existing between the parties," ... and determines the rights and equities between the parties, it is a final judgment, notwithstanding any provision for future determination of the actual amount of recovery.
 
 
 22
 512 F.2d at 213-14 (footnote and citations omitted).
 
 
 23
 We need not decide whether Hattersley can be reconciled with Guarantee Co., or whether Guarantee Co. is moribund. See Buzynski v. Oliver, 538 F.2d 6, 7 (1st Cir.), cert. denied, 429 U.S. 984, 97 S.Ct. 503, 50 L.Ed.2d 596 (1976). Guarantee Co. was not a bankruptcy case, and for the reasons discussed in Part IA, we believe that the "finality" requirement applies differently in the bankruptcy context. That is to say, given the longstanding bankruptcy practice of viewing each "proceeding" within an overall case as a separate "judicial unit," given the tradition of appealability, and given the absence of any indication that Congress intended the 1978 Act to change the scope of general appellate jurisdiction in this respect, we do not believe that Guarantee Co. determines the status of the present order as a "final judgment, order, or decree" under 28 U.S.C. § 1293.
 
 
 24
 It is true that the present order, like the order in Guarantee Co., expressly conditions the amount due under one claim on the amounts recoverable under other claims. However, this order does not differ in that respect from any bankruptcy order allowing a claim against a debtor's estate. Almost without exception, the amount that any one creditor ultimately receives in bankruptcy depends on the result of litigation by other creditors, regardless of whether the order allowing the creditor's claim expressly conditions the award on the outcome of the disputes. To extend the rule in Guarantee Co. to this order therefore would mean that no order recognizing a claim or priority would be "final" until the entire bankruptcy case was completed--or at least until all other claims of equal or greater priority were resolved.
 
 
 25
 We conclude that as long as an order allowing a claim or priority effectively settles the amount due the creditor, the order is "final" even if the claim or priority may be reduced by other claims or priorities. An order that expressly conditions one claim or priority on another is no less final. It does not introduce an element of uncertainty or contention to an order where none otherwise would exist; it merely recognizes the legal and practical realities of bankruptcy proceedings. Cf. Keith v. Kilmer, 272 F. 643, 647 (1st Cir.) (hearing appeal from bankruptcy order that allowed claim by shareholder but expressly subordinated claim to those of general creditors), cert. denied, 257 U.S. 639, 42 S.Ct. 51, 66 L.Ed. 410 (1921). We therefore hold that the order in this case was an appealable "final judgment, order, or decree" under § 1293(b), and we turn to the merits.
 
 II
 
 26
 The part of § 507(a)(4) which is relevant to this appeal provides a priority for "unsecured claims for contributions to employee benefit plans arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first." Section 507(a)(4) was enacted in response to two Supreme Court decisions construing the 1898 Act, United States v. Embassy Restaurant, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1958), and Joint Industry Board v. United States, 391 U.S. 224, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968). In these two cases, the Supreme Court held that the 1898 Act's wage priority, 11 U.S.C. § 104(a)(2) (repealed 1978), did not cover employer contributions to union-operated welfare and annuity funds. The legislative history of § 507(a)(4) makes it clear that Congress meant to overrule Embassy Restaurant and Joint Industry Board and to provide a qualified priority for "fringe benefits." See H.R.Rep. No. 595, 95th Cong., 1st Sess. 537 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978). The controversy in this case is whether Congress meant to create a priority merely in the narrow factual setting present in the two Supreme Court cases, as the trustee argues, or whether "contributions to employee benefit plans" should be read more broadly to cover plans that are not the product of collective bargaining and are not administered by a union, as Northwestern contends. The bankruptcy court ruled that the trustee's preferred construction was inconsistent with the language, legislative history, and underlying policies of § 507(a)(4), and that Northwestern's interpretation was correct. We agree.
 
 
 27
 In order to understand the trustee's arguments, it is necessary briefly to review the details of the insurance plan administered by Northwestern. Saco employed several hundred non-unionized employees in a leather tanning operation. Saco provided the workers with group life, health, and disability insurance through a master policy with Northwestern. The insurance plan was "unilateral." That is to say, because the employees were not unionized, the plan was not required by a collective bargaining agreement, and Saco was not contractually required to provide the coverage at all. The plan was also formally "noncontributory," meaning that the premiums were paid solely by Saco. However, the record contains testimony that the plan resulted in a de facto "bargain" in which employees accepted lower wages than other firms paid in return for a noncontributory plan.
 
 
 28
 The trustee argues that § 507(a)(4) should be read narrowly in two major respects, each of which he believes would disallow Northwestern's priority. First, he argues that "employee benefit plans" should be interpreted to cover only those plans that the employer is contractually obligated to provide his employees through a formal agreement--perhaps only those contained in a union collective bargaining agreement. Second, he argues that in any event, the priority can be claimed only by employees or their "fiduciaries," not by insurers.
 
 
 29
 The bankruptcy court rejected the first argument for one simple reason, with which we agree. Congress' object in enacting § 507(a)(4) was to extend the 1898 Act's wage priority to new forms of compensation, such as insurance and other fringe benefits. Insurance is no less a fringe benefit because it is granted by an employer "unilaterally" rather than being provided under the terms of a collective bargaining agreement. Nothing in the legislative history of § 507(a)(4) suggests the contrary. See generally H.R.Rep. No. 595, 95th Cong., 1st Sess. 537 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978). The numerous references in the committee reports to collective bargaining reflect the fact that Embassy Restaurant and Joint Industry Board, the two cases that Congress sought to overturn, involved unionized workforces and collective bargaining agreements. But to interpret the Act's language restrictively in light of these facts would be to create a distinction without a difference.
 
 
 30
 We see no merit in the trustee's related argument that the employees must have "substituted" the fringe benefits for wages. Such substitution can normally be assumed, unless the employer is a philanthropist. Regardless, here the bankruptcy court found that Saco used the insurance plan to attract employees, and a former Saco official testified that Saco was able to offer lower wages by "substituting" the noncontributory plan.
 
 
 31
 Neither do we see any reason to deny insurance companies the right to obtain the priority for premiums attributable to insurance plan fringe benefits. To allow the insurer to obtain its premiums through the priority would seem the surest way to provide the employees with the policy benefits to which they are entitled. In principle, as the trustee suggests, the employees might be required to obtain the premiums themselves and pay them over to the insurer if they so chose; in practice, however, this would simply require a more complicated administrative path to the same result. The employees cannot be harmed by the insurance company's right to assert the § 507(a)(4) priority, for the priority is expressly subordinated to the § 507(a)(3) wage priority.
 
 
 32
 The trustee's final argument, that § 507(a)(4) is not intended to save insurers from their "bad business judgment," is beside the point. The company is protected in order to protect Saco's employees, not to hold it harmless from errors in business judgment.
 
 
 33
 In sum, we believe that the bankruptcy court's analysis of § 507(a)(4) is essentially correct, and its priority order is
 
 
 34
 Affirmed.
 
 
 
 *
 Of the United States Court of International Trade, sitting by designation